USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: ___JAN 0 8 2007___

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA      :

    -v-      :

DAVID MCQUILLIN,      :

          Defendant.      :

- - - - - - - - - - - - - - - - -x

**INFORMATION**

07 Cr.

**07 CRIM. 017**

## COUNT ONE

### (Conspiracy To Commit Securities Fraud)

The United States Attorney charges:

### RELEVANT PERSONS AND ENTITIES

1. At all times relevant to this Information, Aspen Technology, Inc. ("Aspen") was a corporation organized under the laws of the State of Delaware with its headquarters in Cambridge, Massachusetts. Aspen's securities were registered with the United States Securities and Exchange Commission ("SEC") pursuant to Section 12(g) of the Securities Exchange Act of 1934 (the "Exchange Act"). Aspen's common stock was traded on the NASDAQ National Market System, an electronic market system administered by the NASD, under the symbol "AZPN."

2. At all times relevant to this Information, DAVID MCQUILLIN was a senior officer at Aspen. From in or about May 1997 up to in or about September 2002, DAVID MCQUILLIN was the Executive Vice President, Worldwide Sales and Marketing. In

addition to this position, from in or about January 2001 through in or about September 2002, MCQUILLIN was the Co-Chief Operating Officer of Aspen.  From in or about October 2002 through in or about November 2004, MCQUILLIN was the CEO and President of Aspen.  While CEO of Aspen, MCQUILLIN signed its Annual Reports filed with the United States Securities and Exchange Commission ("SEC").  At various times relevant to this Information, MCQUILLIN owned a substantial number of shares, and options to purchase shares, of Aspen stock.

## BACKGROUND

3.   At all times relevant to this Information, Aspen was in the business of developing and selling computer software used in various process industries, including oil refining and chemical manufacturing.  In addition, Aspen provided services related to the implementation of that software to users of Aspen products.

4.   At all times relevant to this Information, in order to maintain public trading of its securities in the United States, Aspen was required to comply with the federal securities laws, including the Exchange Act and the rules and regulations promulgated thereunder, which are designed to ensure that a company's financial information is accurately recorded and accurately disclosed to the public.  Specifically, at all times relevant to this Information, pursuant to the Exchange Act and

2

the rules and regulations promulgated thereunder, Aspen was required to: (a) file with the SEC annual financial statements (on SEC Form 10-K) that had been audited by independent certified public accountants; (b) file with the SEC quarterly financial reports (on SEC Form 10-Q); and (c) make and keep books, records, and accounts that accurately and fairly reflected Aspen's business transactions.  Aspen operated on a fiscal year ending June 30, and therefore filed its annual report on SEC form 10-K after the close of the quarter ending June 30 and filed quarterly reports on SEC form 10-Q after the close of quarters ending September 30, December 31, and March 31.

5.  At all times relevant to this Information, Aspen employed Arthur Anderson LLP ("Arthur Anderson") as its independent auditor.  Arthur Anderson performed year end audits of Aspen's financial statements and quarterly reviews of selected Aspen financial information.  Arthur Anderson also performed other accounting tasks as requested, including a special review and investigation of Aspen's revenue recognition procedures beginning in January 2002.

6.  At all times relevant to this Information, Aspen provided members of the investing public with information concerning Aspen's financial results and operating performance. Aspen provided such information through various methods, including in its public filings with the SEC, in periodic news

3

releases and other corporate announcements, in statements made in conference calls with professional securities analysts and investors, and in meetings and conferences held with investors. DAVID MCQUILLIN participated in this process by attending conference calls and meetings with analysts and investors, and by providing information that was included in Aspen's financial results and public filings.  Members of the investing public considered and relied upon the information provided by Aspen in deciding whether to purchase, hold, or sell Aspen securities.

        7.  Part of the information routinely provided by Aspen to members of the investing public were Aspen's expectations concerning Aspen's future revenues and financial results for upcoming reporting periods.  DAVID MCQUILLIN participated in developing Aspen's revenue targets and in reporting those estimates to the investing community, through, among other means, conference calls with securities analysts and investors.

        8.  At all times relevant to this Information, numerous securities analysts and investors relied on the financial information and revenue targets provided by Aspen to gauge Aspen's performance and to disseminate estimates of Aspen's expected performance to the larger investing public.  Members of the investing public closely followed such "earnings estimates" or "analysts' expectations" because, historically, when a company's financial performance fails to meet such estimates,

4

that company's stock price typically declines, and when a company's financial performance exceeds such estimates, the company's stock price typically rises.

9.   At all times relevant to this Information, Aspen's revenues came primarily from two sources: a) the sale of licenses for computer software that Aspen developed and b) the sale of services that Aspen provided to customers in connection with the use of that software.  Because Aspen's profit margins were significantly higher for software license sales, and because software license sales often determined future service revenues, many securities analysts and investors considered the size and growth of Aspen's software license revenue to be one of the most important measures of Aspen's financial performance.

10.   From in or about January 2001 through at least in or about January 2002, Aspen's Board of Directors had placed DAVID MCQUILLIN in competition with his co-Chief Operating Officer ("co-COO") to become the next CEO of Aspen.  During this so-called "bake off" for the CEO job, MCQUILLIN was evaluated largely on the basis of Aspen's success in software license sales.

## **THE SCHEME TO DEFRAUD**

### **Introduction**

11.   As set forth more fully below, from in or about December 2000 through in or about September 2002, DAVID MCQUILLIN

5

and his co-conspirators engaged in an illegal scheme to deceive members of the investing public, Aspen shareholders, Aspen's Board of Directors, securities analysts, Aspen's outside auditors, the SEC and others concerning Aspen's true financial results and software license revenues by claiming that certain software license agreements had been reached in certain financial periods, when in fact they had not.  Through this scheme MCQUILLIN and his co-conspirators made it appear as though Aspen's financial performance was better in various quarters than it actually was, thereby making it appear that Aspen had either met, exceeded, or come closer to its financial targets and analysts' expectations than it actually had.

12.  From in or about December 2000 through in or about September 2002, in furtherance of the scheme, DAVID MCQUILLIN and his co-conspirators made and caused Aspen to make statements to the public and to other investors which (a) falsely described Aspen's financial results and software license revenues, (b) omitted to disclose material facts necessary to make the statements made about Aspen's financial results and software license revenue complete, accurate, and not misleading, and (c) caused Aspen to file financial statements with the SEC that presented a materially false and misleading description of Aspen's financial results and software license revenues.

13.  Among other false and fraudulent means used to manipulate Aspen's revenues and other financial results, DAVID MCQUILLIN and others: (a) caused Aspen to report to investors software license revenues that were subject to side agreements or contingencies that made that revenue not recognizable, thereby making it appear to the investing public that Aspen had met certain financial targets when in fact it had not; (b) backdated software license agreements into financial quarters earlier than they were actually finalized in order to recognize revenue at an earlier point in time and thereby either come closer to, reach, or exceed Aspen's quarterly revenue targets, and (c) provided false or misleading information to the outside accountants who audited and reviewed Aspen's financial statements and conducted a special review and investigation of Aspen's revenue recognition procedures.

## THE U.S. COMPUTER COMPANY TRANSACTION

14.  At the end of December 2000, which was the close of Aspen's second quarter for its fiscal year ending June 30, 2001, DAVID MCQUILLIN knew that Aspen was short of its estimates and analysts' expectations for software license revenues and financial performance for that quarter.  In order to close the gap, MCQUILLIN engaged in a scheme to complete the sale of software to a United States-based computer company (the "Computer Company") in January 2001, but to claim falsely to Aspen's

auditors and investors that it had been completed in December 2000.  The deal with the Computer Company, ultimately reached in mid-January 2001, was for approximately $2.75 million in software sales, and was backdated to December 29, 2000 so that revenue from that sale could be included in the second fiscal quarter's financial results.

15.  On or about December 29, 2000, the last business day of Aspen's second fiscal quarter, Aspen offered, based on its "current needs at the end of the quarter," to sell $3 million in software to the Computer Company.  Aspen proposed that the Computer Company then resell that software to end-users, including customers that Aspen already had in its "pipeline." Aspen further offered to double the "commissions" that the Computer Company would receive for those resales.  Subsequently, during the beginning of January 2001 and after the close of Aspen's second fiscal quarter, MCQUILLIN and others at Aspen attempted to close the sale.

16.  On or about January 9, 2001, DAVID MCQUILLIN participated in drafting a script for a sales phone call with the Computer Company.  The script proposed that the Computer Company and Aspen "complete the deal we have been working on with you over the past several days."  The script set forth the advantages for the Computer Company, including the higher commission rate and Aspen's commitment to "pull down" the Computer Company's

8

"pre-purchase" of software from Aspen by shipping the software directly to end-user customers already lined up by Aspen. The script stated that Aspen is "very interested in making this happen" and "we have a license document drafted and ready for signature which is the document we need for revenue recognition."

17. On or about January 9, 2001, representatives of the Computer Company informed Aspen that the Computer Company group in the United States with whom Aspen had been negotiating would not go through with the deal. Subsequent to January 9, 2001, DAVID MCQUILLIN and others at Aspen attempted to complete the sale with a European group of the Computer Company. On or about January 15, 2001, a representative of the European group of the Computer Company signed a Software License Agreement between Aspen and the Computer Company, which was backdated to December 29, 2000.

18. On or about January 24, 2001, DAVID MCQUILLIN participated in a conference call that Aspen held with investors and securities analysts, including some from firms based in New York, New York. During that call, and in a press release issued that same day, Aspen announced its earnings and revenue figures for the quarter ended December 31, 2000, which included license revenue growth of 39% to $40.6 million for the quarter. Those figures included approximately $2.75 million in revenue from the software license sale to the Computer Company, even though as

DAVID MCQUILLIN and others well knew, that contract had not been completed and signed until the following quarter.

19.   On or about February 14, 2001, Aspen filed its report with the SEC on form 10-Q for the quarter ending December 31, 2000.  In that report, Aspen included approximately $2.75 million in revenue from the sale of software to the Computer Company, even though, as DAVID MCQUILLIN well knew, that contract had not been completed and signed until the following quarter.

## THE RUSSIAN OIL COMPANY TRANSACTION

20.   At the end of June 2001, which was the close of Aspen's fourth fiscal quarter and fiscal year ending June 30, 2001, DAVID MCQUILLIN knew that Aspen was short of its estimates and analysts' expectations for software license revenues and financial performance for that quarter.  In order to close the gap, MCQUILLIN engaged in a scheme to deceive Aspen's auditors and investors by signing a software license agreement with a Russian Oil Company ("Oil Company") that was (a) backdated so that the revenue could be recognized in the quarter ending June 30, 2001, and (b) subject to side agreements that made the revenue from that contract not recognizable.

21.   On or about June 27, 2001, DAVID MCQUILLIN sent an email to senior employees and officers at Aspen about the potential license sale to the Oil Company.  In that email, MCQUILLIN stated "we have to have this one as you know,"

10

discussed completing the deal after the end of the quarter, and directed certain employees to "minimize the circle of people involved in closing this deal and refrain from any further discussion of our closing strategy via e-mail or verbally."

22. On or about June 29, 2001, DAVID MCQUILLIN sent an email to various senior employees and officers at Aspen stating that certain revenue has recently "vaporize[d]," that "we can't make the quarter" without certain additional revenue, and that "I don't have a back-up plan."

23. In or about early July 2001, after the close of the fiscal quarter and year on June 30, 2001, DAVID MCQUILLIN traveled to Russia to negotiate with the Oil Company. During those negotiations, the Oil Company resisted entering into the software license agreement proposed by Aspen. On or about July 5, 2001, MCQUILLIN sent an email to senior officers at Aspen attaching a letter addressed to the Oil Company. In the email MCQUILLIN directed the recipients to "please destroy after reading." In the letter to the Oil Company, MCQUILLIN stated that "as a quarterly driven software company our business model requires that we book significant software license revenue." MCQUILLIN also stated that he would remain in Moscow "[t]o ensure that we reach final agreement" by July 10, 2001.

24. On or about July 10, 2001, no agreement had been reached. That same day, DAVID MCQUILLIN proposed that the Oil

11

Company sign a software license agreement with Aspen, but
promised to provide a "side letter" that would give the Oil
Company the right to cancel the software license agreement if
certain additional agreements were not completed between the
parties by August 1, 2001.  MCQUILLIN stated this proposal would
allow Aspen to recognize the license revenue for its year ending
June 30, 2001, and would impose no financial risk on the Oil
Company because the software license agreement would not be
"valid" or "binding."  MCQUILLIN attached a draft "side letter"
granting the Oil Company "unconditional right to cancel the
Software License Agreement" if the companies did not reach
additional agreements by August 1, 2001.

        25.  On or about July 13, 2001, DAVID MCQUILLIN and the
Oil Company signed a software license agreement (the "SLA"),
which was backdated to June 29, 2001.  In or about July 2001, the
Russian Oil Company and MCQUILLIN signed a separate agreement
granting Yukos "unconditional rights of unilateral withdrawal of
[the Oil Company's] commitments" in the SLA if certain additional
agreements were not reached by August 1, 2001 ("Side Agreement
#1").

        26.  In or about late July 2001, Arthur Anderson was
conducting an audit of Aspen's financial records and sought to
confirm the SLA.  On or about July 19, 2001, the Aspen finance
department sent a form letter to the Russian Oil Company asking

it to confirm that, among other things, there were no side
agreements, contingencies or other agreements affecting the SLA.
The Oil Company refused to complete that form.

      27.  In or about early August 2001, the additional
agreements referred to in Side Agreement #1 had not been
completed.  DAVID MCQUILLIN drafted a letter to a representative
of the Oil Company asking it to let "stand" the SLA that was
"conditionally" signed in July and to sign a letter to Aspen's
auditors confirming the SLA.  In exchange, Aspen would provide a
"comfort letter" to the Oil Company giving it the right to cancel
a portion of the SLA at a later date if certain conditions were
not met.  MCQUILLIN stated: "I need your support on a matter of
the most extreme urgency... Aspen will officially report its
Fourth Quarter financial results on Tuesday August 7[th].  We need
to include the [Oil Company] software license, that you
conditionally signed, in our results to meet our targets.  That
is why I pushed so hard with you and [the Oil Company] in early
July.  If we are now forced to unbook the [Oil Company] deal from
our results it will cause extreme damage to AspenTech, our
relationship with [the Oil Company] and me personally.  This is a
very, very serious issue for us... Bottom line Michael, I am
asking you to do a favor for Aspentech.... In exchange, I want
you to do something that will help AspenTech but not cost [the
Oil Company] anything."

28.  On or about August 4, 2001, DAVID MCQUILLIN drafted a "side letter" providing that the Oil Company would allow the SLA to stand, but granting the Oil Company the right to make changes to and cancel portions of the SLA in the future. MCQUILLIN directed that Aspen's head of European sales sign the letter and that Aspen employees "Treat this letter as strictly confidential and do not further forward via e-mail except [to a translator].  Delete all sent e-mails after [the translator] translates and only keep an electronic copy on your machine for the moment."

29.  On or about August 7, 2001, Aspen's head of European Sales signed a letter to the Oil Company. ("Side Agreement #2").  Side Agreement #2 provided that the parties would amend or modify the SLA in the future so that the Oil Company's payments would be subject to certain additional conditions.

30.  On or about that same date, August 7, 2001, the Oil Company sent a letter to Aspen, with a copy to Arthur Anderson, confirming the SLA "signed June 29, 2001" and stating that payments under that SLA were not contingent upon any future events.

31.  On or about that same date, August 7, 2001, DAVID MCQUILLIN and other senior Aspen officers and employees signed a letter to Arthur Anderson stating: "In connection with the

Software License and Service Agreement dated June 29, 2001 between Aspen Technology, Inc. (Aspen) and [the Oil Company], we represent to you that there are no contingencies, amendments or modifications to the original agreement, side agreements (verbal or written) or expected future concessions under this agreement between Aspen and [the Oil Company]."

32.  On or about that same date, August 7, 2001, Aspen issued a press release and conducted a conference call with investors and securities analysts, including some from investment firms based in New York, New York, in which it announced approximately $40 million in software license revenue for the fourth quarter ending June 30, 2001.  Those figures included approximately $4.3 million in revenue from the Oil Company SLA, even though, as DAVID MCQUILLIN well knew, that agreement had been backdated into the quarter and subject to side agreements. During the conference call and in the press release, Aspen described the Oil Company transaction as one of the largest it had closed that quarter.

33.  On or about September 28, 2001, Aspen filed its annual report on Form 10-K with the SEC.  Aspen recognized approximately $4.3 million in revenue from the Oil Company SLA for the quarter ending June 30, 2001, which represented approximately 10.7% of license revenue for the quarter.

34.  Aspen later received only $977,750 in payments

15

from the Oil Company in connection with the Oil Company SLA.   In
or about September 2002, Aspen filed its annual report for fiscal
year 2002 on Form 10-K.   That report contained fiscal year 2001
revenue figures, which included revenue from the Oil Company SLA.
Aspen wrote off the remainder of the revenue recognized from the
Oil Company SLA in fiscal years 2003 and 2004.

**THE BACKDATING INVESTIGATION**

35.   In or about late 2001, employees at Aspen raised
concerns that contracts were being completed and signed after the
close of the fiscal quarter and then backdated so that the
revenue could be recognized in the prior quarter.   In or about
January 2002, at the direction of the Audit Committee of Aspen's
Board of Directors ("Audit Committee"), Arthur Anderson and
others conduct an independent internal investigation of the
questions raised about backdating and of Aspen's revenue
recognition procedures.   The Computer Company and Oil Company
transactions described in paragraphs 14 through 34 were
investigated as part of that review.

36.   On or about January 28, 2002, as part of the
investigation of backdating at Aspen, auditors from Arthur
Anderson interviewed DAVID MCQUILLIN.   During that interview,
MCQUILLIN informed the auditors that the Computer Company
contract had been completed and signed prior to the close of the
quarter ending December 31, 2000, even though, as MCQUILLIN well

knew, it had not.

## THE CONSPIRACY

37.   From in or about December 2000 through in or about September 2002, in the Southern District of New York and elsewhere, DAVID MCQUILLIN, the defendant, and others known and unknown, unlawfully, willfully, and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States, namely (a) to commit fraud in connection with the purchase and sale of securities issued by Aspen, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5; (b) to make and cause to be made false and misleading statements of material fact in applications, reports, and documents required to be filed under the Securities Exchange Act of 1934 and the rules and regulations thereunder, in violation of Title 15, United States Code, Sections 78m(a) and 78ff; and (c) to falsify books, records, and accounts of Aspen, in violation of Title 15, United States Code, Sections 78m(b)(2)(A), 78m(b)(5) and 78ff, and Title 17, Code of Federal Regulations, Section 240.13b2-1.

### Objects Of The Conspiracy

### Fraud In Connection With The
### Purchase And Sale Of Securities

38.   It was a part and an object of the conspiracy that DAVID MCQUILLIN, the defendant, and others known and unknown, un-

lawfully, willfully, and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, would and did use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities issued by Aspen, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes, and artifices to defraud; (b) making and causing Aspen to make untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon the purchasers and sellers of Aspen securities, in violation of Title 15, United States Code, Sections 78j(b) and 78ff.

### False Statements In <u>Annual And Quarterly SEC Reports</u>

39.   It was further a part and an object of the conspiracy that DAVID MCQUILLIN, the defendant, and others known and unknown, unlawfully, willfully, and knowingly, in applications, reports, and documents required to be filed under the Securities Exchange Act of 1934 and the rules and regulations thereunder, would and did make and cause to be made statements that were false and misleading with respect to material facts, in

violation of Title 15, United States Code, Sections 78m(a) and
78ff.

## **False Books And Records**

40.   It was further a part and an object of the
conspiracy that DAVID MCQUILLIN, the defendant, and others known
and unknown, unlawfully, willfully, and knowingly would and did,
directly and indirectly, falsify and cause to be falsified books,
records, and accounts subject to Section 13(b)(2) of the
Securities Exchange Act of 1934, namely books, records, and
accounts of Aspen, an issuer with a class of securities
registered pursuant to the Securities Exchange Act of 1934, which
Aspen was required to make and keep, accurately and fairly
reflecting, in reasonable detail, the transactions and
dispositions of the assets of Aspen, in violation of Title 15,
United States Code, Sections 78m(b)(2)(A), 78m(b)(5) and 78ff,
and Title 17, Code of Federal Regulations, Section 240.13b2-1.

## **Means And Methods Of The Conspiracy**

41.   Among the means and methods by which DAVID
MCQUILLIN, the defendant, and his co-conspirators would and did
carry out the conspiracy were the following:

a.   MCQUILLIN and his co-conspirators backdated
and caused customers to backdate software license agreements into
financial quarters earlier than they were actually finalized in
order to recognize revenue at an earlier point in time, thereby

making it appear that Aspen had come closer to, reached, or exceeded revenue targets and expectations, when in fact it had not.

   b. MCQUILLIN and his co-conspirators provided false and misleading information to Aspen's auditors.

   c. MCQUILLIN and his co-conspirators caused Aspen to report to investors software license revenue that was subject to agreements making that revenue not recognizable, thereby making it appear to the investing public that Aspen had met certain financial targets when in fact it had not.

   d. MCQUILLIN and his co-conspirators provided false and misleading financial information to the investing public and analysts.

   e. MCQUILLIN and his co-conspirators caused Aspen to file publicly with the SEC quarterly and annual reports that materially misstated, among other things, Aspen's software license revenues.

   f. MCQUILLIN and his co-conspirators used facilities of interstate and foreign commerce in furtherance of the objects of the conspiracy.

**Overt Acts**

42.   In furtherance of the conspiracy and to effect its
illegal objects, DAVID MCQUILLIN and his co-conspirators
committed the following overt acts, among others, in the Southern
District of New York and elsewhere:

a.   In or about late December 2000, MCQUILLIN and
others began attempting to sell software licenses to the Computer
Company.

b.   In or about January 2001, MCQUILLIN and
others participated in the negotiation of a software license
agreement with the Computer Company.

c.   In or about January 2001 MCQUILLIN and others
participated in the drafting of a software license agreement with
the Computer Company

d.   On or about January 24, 2001, MCQUILLIN and
others provided false and misleading financial information to
securities analysts and the investing public through a press
release and conference call.

e.   On or about February 14, 2001, MCQUILLIN and
others caused Aspen to issue a quarterly report on Form 10-Q
containing false and misleading financial information.

f.   In or about July 2001, MCQUILLIN and others
attempted to negotiate a software license agreement with the Oil
Company.

21

g.   On or about July 5, 2001, MCQUILLIN sent an e-mail to senior officers at Aspen directing them to "please destroy after reading" and attaching a letter to the Oil Company proposing to complete an agreement by July 10, 2001.

h.   On or about July 13, 2001, MCQUILLIN signed a software license agreement with the Oil Company backdated to June 29, 2001.

i.   In or about July 2001, MCQUILLIN entered into a side agreement with the Oil Company.

j.   On or about August 4, 2001, MCQUILLIN drafted another side agreement with the Oil Company.

k.   On or about August 7, 2001, MCQUILLIN and others signed a letter to Arthur Anderson.

l.   On or about August 7, 2001, MCQUILLIN and others caused Aspen to provide false and misleading financial information to securities analysts and the investing public through a press release and conference call.

m.   On or about September 28, 2001, MCQUILLIN and others caused Aspen to issue an annual report on Form 10-K containing false and misleading financial information.

n.   On or about January 28, 2002, MCQUILLIN provided false information to auditors from Arthur Anderson who were conducting an investigation of backdating of contracts at

Aspen.

o.   In or about September 2002, MCQUILLIN and others caused Aspen to issue an annual report on Form 10-K containing false and misleading financial information.

(Title 18, United States Code, Section 371.)

## COUNT TWO

### (Securities Fraud)

The United States Attorney further charges:

43.   The allegations contained in paragraphs 1 through 36 and paragraphs 41 and 42 of this Information are repeated and realleged as if fully set forth herein.

44.   From in or about December 2000 up to and including in or about September 2002, in the Southern District of New York and elsewhere, DAVID MCQUILLIN, the defendant, unlawfully, willfully and knowingly, directly and indirectly, by the use of the means and instrumentalities of interstate commerce, and of the mails, and of facilities of national securities exchanges, in connection with the purchase and sale of securities, used and employed manipulative and deceptive devices and contrivances in violation of Title 17, Code of Federal Regulations, Section 240.10b-5 by (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which

they were made, not misleading; and (c) engaging in acts,
practices and courses of business which operated and would
operate as a fraud and deceit upon purchasers and sellers of
Aspen common stock.

(Title 15, United States Code, Sections 78j(b) and 78ff;
Title 17, Code of Federal Regulations, Section 240.10b-5;
Title 18, United States Code, Section 2.)

MICHAEL J. GARCIA
United States Attorney

January 5, 2007

Filed Waiver of Indictment and Information.
Deft. pres. w/atty: Paul Scheckman. AUSt:
Jonathan Streeter present. Deft. arraigned
and pleads not guilty. Deft.

Freeman, USMJ